**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| SEVA HOLDINGS INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 2022-0437-PRW |
| | ) |
| OCTO PLATFORM EQUITY | ) |
| HOLDINGS, LLC, | ) |
| | ) |
| Defendant. | ) |

Submitted: August 8, 2024
Decided: August 29, 2024

*Upon Octo Platform Equity Holdings, LLC 's*
*Motion for Partial Summary Judgment*,
**GRANTED IN PART AND DENIED IN PART.**

*Upon Seva Holdings Inc.'s*
*Motion for Partial Summary Judgment*,
**DENIED.**

**<u>MEMORANDUM OPINION AND ORDER</u>**


Alan D. Albert, Esquire, O'HAGAN MEYER PLLC, Wilmington, Delaware, Charles M. Sims, Esquire (*argued*), Rachael L. Loughlin, Esquire, C. Quinn Adams, Esquire, O'HAGAN MEYER PLLC, Richmond, Virginia. *Attorneys for Plaintiff Seva Holdings, Inc.*

Brian C. Ralston, Esquire, Daniel M. Rusk, IV, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Paul A. Werner, Esquire, Imad Matini, Esquire (*argued*), SHEPPARD MULLIN RICHTER & HAMPTON, LLP, Washington, District of Columbia. *Attorneys for Defendant Octo Platform Equity Holdings, LLC.*


**WALLACE, J.**

## I. INTRODUCTION

This Opinion addresses the applicability of the absolute litigation privilege to the repurchase of a member's interests in a Delaware limited liability company. The defendant here sought to repurchase the plaintiff's interests on the basis of alleged violations of a non-disparagement clause. Delaware recognizes the right of a party to pursue one's claims in court without fear of incurring liability for his statements in a judicial proceeding. That protection extends to contractual non-disparagement claims. But as now explained, the absolute litigation privilege does not operate to nullify the repurchase of a member's interests where allegedly defamatory statements trigger the repurchase right.

## II. BACKGROUND

### A. THE ACQUISITION

In 2003, Arvinder ("Sonny") Kakar founded Sevatec, LLC.[1] Sevatec was a technology services firm that provided a variety of services to federal government agencies, including design, development, security and operations, as well as cloud service and data integration.[2]

In November 2020, Octo Consulting Group, LLC ("Octo Consulting"), a technology solutions provider, acquired Sevatec through a stock purchase agreement

---

[1] Transmittal Affidavit of Alan D. Albert in Support of Opening Brief in Support of Motions for Summary Judgment and Partial Summary Judgment ("Albert Trans. Aff."), Ex. 1 ¶ 2 (D.I. 97).

[2] *Id.* ¶ 3.

(the "SPA").[3]  The SPA contained indemnification provisions for certain representations agreed to by the parties and provided for certain post-closing adjustment payments.

Following the acquisition, Mr. Kakar remained involved in the business.  He held the title of Vice Chair and Head of Strategy under the Executive Employment Agreement ("Employment Agreement").[4]  Under the Employment Agreement and Non-Competition Agreement, he agreed to be bound by confidentiality, non-compete, non-solicit, non-interference, and non-disparagement clauses.[5]  Based on Sevatec's performance, Mr. Kakar was also entitled to earn potential payments pursuant to the Additional Payments Agreement.[6]

Mr. Kakar sat on the board of Octo Consulting's parent, Octo Platform Equity Holdings, LLC ("Octo Platform").[7]  Through a holding company, Seva Holdings, Inc. ("Seva"), he received membership interests in Octo Platform.[8]  The Side Letter

---

[3]   Transmittal Affidavit of Daniel M. Rusk, IV in Support of Defendants' Opening Brief in Support of their Motions for Partial Summary Judgment ("Rusk Trans. Aff."), Ex. C ("SPA"), Preamble (D.I. 91); Rusk. Trans. Aff., Ex. H.

[4]   Rusk Trans. Aff., Ex. K § 3 ("Employment Agreement").

[5]   Employment Agreement § 9, *id*. Ex. J ("Non-Competition Agreement") §§ 3.1, 3.2, 3.3, 3.4.

[6]   Rusk Trans. Aff., Ex. E.

[7]   Rusk Trans. Aff., Ex. F ("Side Letter Agreement").  "Octo" will be used to refer to Octo Consulting and Octo Platform without distinguishing between them, unless specificity is required.

[8]   Rusk Trans. Aff., Ex. D; Verified Complaint of Seva Holdings Inc. against Defendants Octo Platform Equity Holdings, LLC, Octo Consulting Group, LLC, and Arlington Capital Partners IV, L.P. ("Ch. Compl.") ¶ 11; SPA at 1-4.  Mr. Kakar's wife, Seema Kakar, in her capacity as trustee of the Kakar Family Irrevocable Trust, also received membership interests in Octo Platform through Seva.  The phrase "the Kakar Parties" will be used to refer to Mr. Kakar and Ms. Kakar

-2-

Agreement and the Amended and Restated Limited Liability Company Agreement of Octo Platform Equity Holdings, LLC ("LLC Agreement") govern Octo's right of repurchase (the "Repurchase Option").[9]

## B. ISSUES ARISE BETWEEN MR. KAKAR AND OCTO

After the acquisition, issues arose between Mr. Kakar and Octo. Mr. Kakar and Octo disagreed on company branding and use of company resources.[10] Mr. Kakar believes Octo "undermined and disparaged him" and sidelined him from management responsibility.[11] Octo claims that Mr. Kakar stopped attending company meetings and events, mismanaged client projects, and damaged employee relationships.[12]

About nine months after the acquisition, in August 2021, Octo issued a notice to Mr. Kakar of his for-cause termination from Octo Consulting and removal from Octo Platform's board.[13] The parties dispute whether Mr. Kakar subsequently resigned or was constructively discharged.[14] Octo then sent Mr. Kakar three notices

without distinguishing between them, unless specificity is required.

[9] Rusk Trans. Aff., Ex. G ("LLC Agreement") § 8.7; Side Letter Agreement.

[10] Defendants' Opening Brief in Support of their Motions for Partial Summary Judgment ("Octo Mot. for Summ. J.") at 23-26, 27 (D.I. 91).

[11] Consolidated Opening Brief in Support of Motions for Summary Judgment and Partial Summary Judgment of Plaintiffs-Counterclaim Defendants Arvinder Kakar, Seema Kakar, Trustee, and Seva Holdings, Inc. ("Kakar Mot. for Summ. J.") at 24-26 (D.I. 97).

[12] Octo Mot. for Summ. J. at 26-28, 31-32.

[13] Rusk Trans. Aff., Ex. N.

[14] Octo Mot. for Summ. J. at 33; Kakar Mot. for Summ. J. at 30-31.

of claims for indemnification pursuant to the SPA—one with respect to a legacy Sevatec project, and the others relating to employee retention payments and bonuses.[15] Mr. Kakar submitted a competing notice for indemnification with respect to post-closing adjustment payments and demanded release of funds held in escrow.[16]

Then, on January 14, 2022, Mr. Kakar sued Octo Platform's board for defamation in Virginia state court (the "Virginia Action")[17] and initiated the first part of this consolidated action in the Delaware Superior Court (the "Superior Court Action").[18] In the Superior Court Action complaint, the Kakar Parties asserted claims for fraudulent inducement (Count I), breach of contract with respect to Mr. Kakar's Employment Agreement (Count II), the Additional Payments Agreement (Count III), and the SPA (Count IV), as well as breach of the implied covenant of good faith and fair dealing (Count V), and have requested declaratory judgment (Count VI).

Octo counterclaimed, asserting breaches under the Employment Agreement (Count I), a breach of Mr. Kakar's Non-Competition Agreement (Count II), a breach

---

[15]   Rusk Trans. Aff., Exs. BM, BN, BT.

[16]   Albert Trans. Aff., Ex. 1(O).

[17]   *See* Ch. Compl., Ex. 9.

[18]   *See* Complaint of Plaintiffs Arvinder (Sonny) Kakar, Seema Kakar, Trustee of the Kakar Family Irrevocable Trust UTA dated December 29, 2009, and Seva Holdings Inc., against Defendant Octo Consulting Group, LLC, C.A. No. N22C-01-104 PRW CCLD (Del. Super. Ct).

of the SPA regarding its indemnification claims (Count III), unjust enrichment (Count IV), and seeking declaratory relief (Count V).[19]

## C. THE REPURCHASE

After Mr. Kakar initiated the Superior Court Action and Virginia Action, on February 14, 2022, Octo informed Seva of its intent to repurchase Seva's membership units in Octo Platform (the "Repurchase Notice").[20]

The Repurchase Option is conditioned in part on the occurrence of a Triggering Event.[21] A Triggering Event includes:

> a material breach by Mr. Kakar of any of the restrictive covenants with respect to confidentiality (but only in the event such breach causes or results in demonstrable material harm to [Octo Platform] or any of its Subsidiaries), non-competition, non-solicitation, non-interference or non-disparagement obligations in either his [Employment Agreement] or his Non-Competition Agreement.[22]

The contents of Octo's Repurchase Notice focus on Mr. Kakar's alleged

---

[19] *Arvinder ("Sonny") Kakar et al., v. Octo Consulting Group, LLC,* C.A. No. N22C-01-104 PRW CCLD (Del. Super. Ct) (D.I 33).

[20] Rusk Trans. Aff, Ex. BW ("Repurchase Notice").

[21] *See* LLC Agreement § 8.7. The Repurchase Option is further conditioned on either Octo's termination of Mr. Kakar without cause or his voluntary termination. *See id*. ("Notwithstanding the provisions of Section 8.7 of the Operating Agreement, the Repurchase Option in favor of the Company and the Sponsor Members shall not apply with respect to any Membership Interests or other equity securities held by Newco and its Transferees in the event of a termination of Mr. Kakar by the Company or any of its Subsidiaries without Cause or if such Termination is voluntary; provided, however, that in the event of such Termination either without Cause or on a voluntary basis or otherwise, the definition of "Triggering Event" as it applies to Newco and its Transferees shall be deemed to include the occurrence, following such Termination, . . .").

[22] Side Letter Agreement § 6.

violations of the non-disparagement obligations. Section 9(d)(i) of the Employment Agreement provides that Mr. Kakar will not "publish or communicate" any "Disparaging" statements concerning Octo.[23] "Disparaging" remarks include "those intended to impugn the character, honesty, integrity, reputation" or "business abilities in connection with any aspect of the operation of business of the individual or entity being disparaged."[24] The non-disparagement obligation, however, is not:

> applicable to (A) truthful testimony obtained through subpoena, (B) any truthful information provided pursuant to investigation by any governmental authority, or (C) any truthful information provided pursuant to any claim by [Mr. Kakar] or [Octo] under the [Employment Agreement].[25]

The Repurchase Notice states that Mr. Kakar's "publicly filed" complaints against Octo contained "numerous statements of a defamatory nature" in alleged violation of the confidentiality and non-disparagement obligations.[26] On that basis, as well as on the alleged "breaches of the non-competition, non-solicitation and non-interference restrictive covenants," Octo initiated procedures to repurchase Seva's membership units in Octo Platform.[27]

Section 8.7(d) of the LLC Agreement sets out the required closing procedures

---

[23] Employment Agreement § 9(d).

[24] *Id*.

[25] *Id*. § 9(d)(iii).

[26] Repurchase Notice at 1.

[27] *Id*.

for the Repurchase. After the calculation of certain offsetting and additive payments, Octo is to deliver a "Repurchase Note for the balance of the Repurchase Price;"[28] the "Repurchase Price shall be paid against the delivery of the certificates or other instruments" of the membership interests.[29] Octo is entitled to "receive customary representations and warranties" with respect to "any securities purchased."[30] If Seva fails to comply with the obligations under Section 8.7, Octo "may thereupon place an amount of, equal to the amount of the purchase price to be paid . . . in escrow . . . whereupon [Octo] shall be entitled to cancel . . . and treat" the membership interests "as having been purchased."[31]

Along with the Repurchase Notice, Octo sent Seva the Repurchase Agreement and Repurchase Note.[32] Mr. Kakar didn't agree to signing the Repurchase Agreement.[33] On April 15, 2022, Octo Platform canceled the membership interests and notified Seva that the Repurchase Note would be held in escrow until Seva delivered an executed Repurchase Agreement.[34]

---

[28] LLC Agreement § 8.7(d)(i).

[29] *Id*. § 8.7(d)(ii).

[30] *Id*. § 8.7(d)(iii).

[31] *Id*.

[32] Rusk Trans. Aff., Exs. A and B to Repurchase Notice.

[33] Albert Trans. Aff., Ex. 1 at ¶ 52, Ex. 1(U).

[34] *Id*., Ex. 1V at 1.

**D. COURT OF CHANCERY COMPLAINT AND IBM ACQUISITION.**

A month later, Seva challenged the Repurchase by filing a new complaint in Delaware—this time in the Court of Chancery ("Court of Chancery Action"). Counts I to III of the Court of Chancery complaint seek declaratory relief that the repurchase of Seva's membership interests is void because of the absolute litigation privilege, Octo's failure to comply with the repurchase procedures, and prior material contractual breaches. Counts IV and V relate to Octo's alleged breaches of the LLC Agreement and refusal to permit Seva to repurchase other employees' membership interests under the Side Letter Agreement. Counts VI and VII seek the imposition of a constructive trust and injunctive relief.

In December 2022, IBM acquired Octo Consulting.[35] The parties entered into a status quo order, agreeing to place into escrow a reserve of the purchase price to cover potential liabilities relating to this consolidated action and the Virginia Action.[36] Plaintiffs in the Superior Court Action voluntarily dismissed the fraudulent inducement claim, and in the Court of Chancery Action, only the claims against Octo Platform survived after Octo's motion to dismiss.

With the Delaware suits consolidated, the parties moved for partial summary judgment. Octo moved for summary judgment on claims relating to the

---

[35] *Id.*, Ex. 15.

[36] *See* D.I. 41.

Employment Agreement, Additional Payments Agreement, Breach of the Implied Covenant of Good Faith and Fair Dealing and declaratory relief count (Counts II, III, V and VI) in the Superior Court Action, all of Octo's counterclaims in the Superior Court Action, and, Seva's claims in the Court of Chancery Action relating to the repurchase (Counts I to III), breaches of the LLC Agreement (Count IV), and requests for relief (Counts VI and VII). With respect to the Superior Court Action, the Kakar Parties moved for summary judgment on Count IV of the LLC Agreement, and the counterclaims. With respect to the Court of Chancery Action, Seva moved for summary judgment on Counts II and V.

At argument on the motions earlier this month, the Court denied the parties' motions for summary judgment in the Superior Court Action via a bench ruling and took the Court of Chancery Action motions under advisement.

## III. STANDARD OF REVIEW

"When opposing parties make cross motions for summary judgment, a judge should not grant . . . summary judgment for one party unless no genuine issue of material fact exists and that party is entitled to judgment as a matter of law."[37] In turn, summary judgment won't be granted for either if there is a material fact in dispute or if it seems desirable to inquire thoroughly into the facts to clarify the

---

[37] *State ex rel. Jennings v. City of Seaford*, 278 A.3d 1149, 1159 (Del. Ch. 2022) (quoting *Wygant v. Geico Gen.*, 2011 WL 3586488, at *1 (Del. Aug. 16, 2011)).

application of the law to the circumstances.[38]

The Court always views the facts in the light most favorable to the opposing party.[39] And, "[u]nder well-established Delaware law, 'the moving party initially bears the burden of showing that no genuine issue of material fact exists."[40] "But when a motion for summary judgment is supported by such a showing . . . the burden shifts to a non-moving party to demonstrate that there are material issues of fact."[41]

"Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with them."[42] Even so, "the [C]ourt is not relieved of its obligation to deny summary judgment if a material factual dispute exists."[43] In the end, summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the

---

[38] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Ct. Jan. 31, 2019) (citing *Ebersol v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962)).

[39] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

[40] *Dieckman v. Regency GP LP*, 2019 WL 5576886, at *11 (Del. Ch. Oct. 29, 2019) (quoting *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[41] *Id.* (cleaned up) (quoting *Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979)); Del. Ch. Ct. Civ. R. 56(e) (the burden shifted to the opponent is to show "there is a genuine issue for trial.").

[42] *Radulski v. Liberty Mutual Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (cleaned up) (quoting identical language from Del. Super. Ct. Civ. R. 56(h)).

[43] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166 (Del. Ch. 2003).

inferences to be drawn therefrom."[44]

## IV. DISCUSSION

The bulk of this consolidated action will proceed to trial. This decision is an attempt to clear the legal underbrush so that the parties can focus their energies on the remaining factual disputes. The Court analysis begins and ends with the Repurchase.

Seva argues the Repurchase was void due to the absolute litigation privilege and invalid due to procedural deficiencies. The Court first addresses the applicability of the absolute litigation privilege to the Repurchase, then moves to its purported procedural deficiencies.

### A. THE ABSOLUTE LITIGATION PRIVILEGE DOES NOT RENDER THE REPURCHASE VOID.

Seva argues that enforcement of the Repurchase Option violates the immunity Delaware law confers on statements made in litigation, including those of a defamatory nature. Because the Repurchase Option was triggered in part on allegedly defamatory statements that Mr. Kakar made in the Virginia and Superior Court Actions, Seva contends that the Repurchase must be held null and void. Seva's request finds no support in Delaware's contractarian regime.

The absolute litigation privilege, "long recognized in Delaware . . . protects

---

[44] *In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 2014 WL 2641304, at *1 (Del. Ch. June 12, 2024) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case."[45] The privilege "encourages citizens to peaceably resolve their differences in court through litigation (or the threat of litigation) by allowing them to speak to their adversaries freely without fear of facing liability for what they say, and without the prospect of having their good faith legal claims prompt the initiation of more claims."[46] "The privilege is designed to encourage candid and full testimony in court, to have parties resolve their disputes peaceably, to let a result issue, and then move on."[47] The privilege shields litigants from defamation and similar tort-based claims, operating as a "complete defense . . . irrespective of accuracy or malice."[48] Three Delaware decisions have discussed the scope of the privilege's protection to contractual claims.

In *Ritchie CT Opps, LLC v. Huizenga Managers Funds, LLC*, the plaintiff sought to enjoin defendant from making allegedly disparaging statements in other

---

[45] *Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC,* 22 A.3d 710, 715 (Del. Ch. 2011) (quoting *Barker v. Huang,* 610 A.2d 1341, 1345 (Del.1992)).

[46] *Id*. (citation).

[47] *Id*. at 721.

[48] *Barker,* 610 A.2d at 1349; *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *12 (Del. Ch. May 30, 2019) (citing *Short v. News-Journal Co.*, 212 A.2d 718, 720 (Del. 1965)).

lawsuits that defendant had initiated against plaintiff.[49] The *Ritchie* plaintiff sought to do so through the enforcement of a non-disparagement clause agreed to by the parties in a subscription agreement.[50] Stopping short of dismissing that plaintiff's contractual non-disparagement claim, the court denied its request for injunctive relief—the only type of relief the plaintiff was seeking.[51] This Court held that the "absolute litigation privilege . . . prevent[s] equity from specifically enforcing, prospectively, the contractual non-disparagement clause in the context of litigation, via injunction."[52] The Court reasoned that granting injunctive relief based on the violation of that contractual clause at-issue "raises the same interests as using tort law to chill litigation."[53] Indeed, "such a use of equity . . . would render contract rights effectively unenforceable."[54] Although the Court in *Ritchie CT Opps* did not hold as a matter of law that the absolute litigation privilege barred a contractual non-disparagement claim, one year later, the Court did in *Sheehan v. AssuredPartners, Inc.*[55]

In *Sheehan*, sellers sold their interests in an insurance company and entered

---

[49] *Ritchie CT Opps, LLC*, 2019 WL 2319284, at *6-7.

[50] *Id*. at *4.

[51] *Id*. at *13.

[52] *Id*.

[53] *Id*. at *14.

[54] *Id*.

[55] 2020 WL 2838575, at *1 (Del. Ch. May 29, 2020).

into employment agreements with the buyer that contained reciprocal non-disparagement obligations.[56] After closing, the buyer discovered alleged fraud in connection with the sale and sued the sellers.[57] Sellers, in turn, sued the buyer for breach of the non-disparagement claim in the employment agreements based on buyer's statements in its complaint.[58] This Court held that the absolute litigation privilege barred the non-disparagement claims because of the risk of "chilling litigation" and creating an unending cycle of side-litigation.[59]

In contrast, the Superior Court in *Feenix Payment Sys., LLC v. Blum* found, on the facts before it, that applying the privilege "undermine[d] [the parties'] freedom of contract."[60] In *Feenix*, the defendant asserted the privilege against defamation and contract-based claims based on allegedly defamatory statements that he had made in a demand letter.[61] The court found that the absolute litigation privilege did not bar the non-disparagement and confidentiality claims.[62] Doing so would "arguably disrupt the private ordering of the parties and thus undermine their

---

[56] *Id.* at *1.

[57] *Id.* at *6.

[58] *Id.* at *8.

[59] *Id.* at *17.

[60] 2022 WL 215026, at *7 (Del. Super. Ct. Jan. 25, 2022).

[61] *Id.* at *2-3.

[62] *Id.* at *8.

freedom of contract."[63]  If parties could "circumvent these provisions by filtering their breaches through a lawyer in the context of potential litigation, such contracts would contain an unforeseen but easily exploited loophole."[64]

The Court distinguished *Sheehan* and *Ritchie CT Opps* as "stand[ing] for the proposition that the absolute litigation privilege will not allow non-disparagement clauses to be used offensively, as a means of gaining an unfair advantage during the litigation process."[65]  The *Feenix* court explained that, in the situation before it, the party was not using the non-disparagement clauses to "prevent the other from effectively litigating its case."[66]  Instead, the statements in *Feenix* were pre-litigation communications, based on a "one-off" event, and involved a request for money damages.[67]  The court concluded that the *Feenix* plaintiff was not using the clauses to "control" the defendant's litigation conduct, and thus the absolute litigation privilege did not apply.[68]

*Sheehan* and *Ritchie CT Opps* on the one hand and *Feenix* on the other display the tension that exists in balancing the public policy interest of encouraging the

---

[63]  *Id*. at *7.

[64]  *Id*.

[65]  *Id*. at *8.

[66]  *Id*.

[67]  *Id*.

[68]  *Id*.

-15-

freedom of a person to pursue one's claims in court and that of upholding the freedom of contract. Whereas *Feenix* falls on the latter end of the spectrum, *Sheehan and Ritchie CT Opps* fall on the former. Seva's arguments similarly pit these policy considerations against one another.

Seva contends that enforcing Octo Platform's Repurchase Option violates the absolute litigation privilege because enforcement of the Repurchase Option would impermissibly chill Mr. Kakar's litigation against Octo. Because the privilege would protect Seva from defamatory and contractual non-disparagement claims, Seva contends that the statements should also be off-limits in triggering the Repurchase Option. In effect, Seva aims to expand the scope of the absolute litigation privilege as a means to nullify the repurchase of a member's interest in a Delaware limited liability company. Seva identifies no Delaware caselaw permitting this. And so, in the Court's balancing of the two policy considerations, freedom of contract prevails, regardless of the collateral effect the Repurchase may have on Mr. Kakar's decision to litigate his claims against Octo.

Delaware law affords primacy to the freedom of contract, especially in the context of provisions governing the internal affairs of a Delaware limited liability company. Given that the Repurchase Option is in a limited liability company agreement, the Court should give "maximum effect to the principle of freedom of

contract and to the enforceability of limited liability company agreements."[69]   The Delaware Supreme Court recently affirmed this principle in forfeiture-for-competition provisions.[70]

In *Cantor Fitzgerald, L.P. v. Ainslie*, former limited partners in a Delaware limited partnership were entitled to payments and other financial incentives upon the condition that they did not engage in competitive and other behavior after their departure from the company.[71]   When the partnership withheld those deferred financial benefits based on the limited partners' alleged competitive behavior, the limited partners brought suit seeking declarations that such forfeiture-for-competition provisions were invalid.[72]   Our high court resolved the divergent policy interests of respecting parties' private agreements and the public interests against restraints of trade in favor of the former.[73]   Finding that the forfeiture-for-competition did not prohibit the limited partners from engaging in competitive behavior, it found the policy interest of disfavoring restraints on trade "significantly

---

[69]   DEL. CODE ANN. tit. 6, § 18-1101(b) (2024).

[70]   *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674 (Del. 2024).   There, the Delaware Supreme Court was applying the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), but the provision regarding the weight placed on the freedom-of-contract principle is identical.   *See* DEL. CODE ANN. tit. 6, § 17-1101(c) (2024) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

[71]   *Cantor Fitzgerald, L.P.*, 312 A.3d at 678-81.

[72]   *Id*. at 682-83.

[73]   *Id*. at 692-93.

weakened."[74] Thus, public-policy considerations weighed in favor of enforcing such provisions.

*Ainslie* and a review of the Delaware precedent on the scope of the absolute litigation privilege counsels a like result here. Under the LLC Agreement, the parties conditioned Seva's membership status on Mr. Kakar's conformity with his obligations under the Employment and Non-Competition Agreements. If Seva were asserting the privilege against any non-disparagement claims Octo was asserting, the privilege would bar such claims. But here, the provision at issue is a repurchase provision, which directly touches on the internal affairs of the company. Accordingly, the Court is "strongly inclined" to respect the parties' right to voluntarily order their affairs unless "dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[75]

No such overriding public policy interest exists. The specter of potentially chilling litigation by enforcing the Repurchase Option is far weaker in comparison to the facts in *Sheehan* and *Ritchie CT Opps*. In *Sheehan* and *Ritchie CT Opps*, defendants sought specific enforcement of non-disparagement clauses that directly targeted defamatory statements plaintiffs made in litigation. Here, Octo is invoking

---

[74] *Id.* at 691.

[75] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 903 (Del. 2021) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch.), *judgment entered*, (Del. Ch. 2005), *aff'd in part, rev'd in part*, 892 A.2d 1068 (Del. 2006)).

a repurchase provision in response to allegedly disparaging statements. Even more so than in *Feenix*, the Repurchase is the quintessential "one-off" event, and like in *Ainslie*, the Repurchase Option itself does not prevent Mr. Kakar from continuing his litigation against Octo. Mr. Kakar is free to continue litigating his claims in the Superior Court and Virginia actions without fear of incurring tort or non-disparagement-based liability for the statements he makes in those actions.[76]

In sum, Delaware law provides for maximum freedom in allowing parties to order their governance arrangements. It doesn't offend the public policy of this state for a Delaware limited liability company's operating agreement to condition a member's ownership in the business on whether a member makes disparaging remarks about the business. Mr. Kakar was represented by sophisticated counsel when he entered into the LLC Agreement and Mr. Kakar is free to litigate the full value to which he is entitled for those interests. The absolute litigation privilege, therefore, has no bearing on the validity of the Repurchase.

Octo's motion for summary judgment dismissing Count I of the Court of Chancery complaint will be granted.

## B. A TRIGGERING EVENT OCCURRED.

Octo is entitled to repurchase Seva's interests upon the occurrence of any one

---

[76] The disparaging statements are not the target of injunctive relief. Though Octo includes breach-of-contract counts against Mr. Kakar as counterclaims, Octo doesn't appear to be moving for injunctive relief on those counts.

breach of the confidentiality obligations, restrictive covenants, or non-disparagement clause. Rather than go through each alleged breach, the Court addresses the breach of the non-disparagement clause and finds that there is no genuine issue of material fact that a breach occurred, thus triggering the Repurchase Option.

Seva's disputation that Mr. Kakar violated the non-disparagement clause is tripartite:[77] (1) the filing of a complaint is not a "communication" within the meaning of the non-disparagement clause, and (2) if it is, there is a dispute as to the truthfulness of the allegations, and (3) the absolute litigation privilege protects Mr. Kakar's statements in a judicial proceeding. Notably, Seva doesn't dispute that the statements fall under the definition of "Disparaging" under the Employment Agreement. The Court has already dismissed Seva's third argument for the reasons given above, so the Court now focuses on the first two.

Seva's first argument—that the filing of a complaint is not a "communication"—is belied by the contract's plain language and the fact that the parties carved out an exception that contemplates that statements could be made in the context of litigation, and hence, in the body of a complaint. Section 9(d)(i) of the Employment Agreement provides that Mr. Kakar will not "publish or

---

[77] Consolidated Answering Brief of Plaintiffs-Counterclaim Defendants Arvinder Kakar, Seema Kakar, Trustee, and Seva Holdings, Inc. in Opposition to Defendants-Counterclaim Plaintiffs' Motion for Partial Summary Judgment ("Kakar Ans. Br.") at 19 (D.I. 102).

communicate" any "Disparaging" statements concerning Octo and its affiliates.[78] "Disparaging" remarks include "those intended to impugn the character, honesty, integrity, reputation" or "business abilities in connection with any aspect of the operation of business of the individual or entity being disparaged."[79] The Employment Agreement further provides that "Disparaging" statements are "not applicable to (A) truthful testimony obtained through subpoena, (B) any truthful information provided pursuant to investigation by any governmental authority, or (C) any truthful information provided pursuant to any claim by [Mr. Kakar] or [Octo] under the [Employment Agreement]."[80]

The Court interprets unambiguous language according to its plain meaning.[81]

Merriam-Webster[82] defines "communicate" thusly: "to convey knowledge of or information about"; "to make known"; or "to transmit information, thought, or feeling so that it is satisfactorily received or understood."[83]

---

[78] Employment Agreement § 9(d).

[79] *Id.*

[80] *Id.* § 9(d)(iii).

[81] *RSUI Indem. Co*, 248 A.3d at 905.

[82] Delaware's courts, including our Supreme Court, have used Merriam-Webster to construe undefined contractual terms. *E.g.*, *Spintz v. Div. of Fam. Servs.*, 228 A.3d 691, 700 (Del. 2020); *USAA Cas. Ins. Co. v. Carr*, 225 A.3d 357, 360 (Del. 2020); *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *22 (Del. Super. Ct. Aug. 16, 2021); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *32 n.298 (July 29, 2021). So, for purposes here, this Court does the same.

[83] *Communicate*, MERRIAM-WEBSTER DICTIONARY (online ed.), www.merriam-webster.com/dictionary/communicate (last visited Aug. 27, 2024); *see also Communication*, *id.* ("information transmitted or conveyed"); *Communicate*, CAMBRIDGE DICTIONARY (online ed.),

Penning statements or averments in a complaint no doubt does all of these these. And a complaint's statements and averments are "information communicated." What's more, the language of the exceptions—"[i]nformation provided pursuant to any claim . . . under the Employment" and "truthful testimony obtained through subpoena"—suggests that the transmission of such information can occur in the body of a complaint.[84] Thus, the making of statements contained in a complaint does indeed "communicate" such under Section 9(d)(i) of the Employment Agreement.

The second argument—that there is a dispute as to the truthfulness of the allegations—fails because that exception only applies with regards to statements provided pursuant to a claim under the Employment Agreement. But the Virginia action was a defamation action against Octo Platform's board and did not involve any employment claims.[85] Thus, given that Seva does not dispute that the statements were themselves disparaging, the statements in the Virginia action alone trigger Octo Platform's Repurchase Option.[86]

Because there is no genuine issue of material fact that a triggering event

---

www.dictionary.cambridge.org/us/dictionary/english/communicate (last visited Aug 27, 2024) ("to share information with others by speaking, writing, . . . or using other signals").

[84] Employment Agreement § 9(d)(iii).

[85] Ch. Compl., Ex. 9.

[86] Even had Seva briefed the issue of the accuracy of the statements, they likely fall under the broad definition of "Disparaging" under the Employment Agreement.

occurred, Octo's motion for summary judgment dismissing Count III of the Court of Chancery complaint will be granted to the extent that Seva seeks a declaration that the Repurchase is void because no triggering event occurred.

## C. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE REPURCHASE WAS PROCEDURALLY VALID.

Seva argues that the Repurchase was procedurally defective because: (a) the unexecuted Repurchase Note was an invalid means of payment and that the LLC Agreement instead required that the full amount of the repurchase price be placed in escrow; (b) cancellation of the units never occurred because Octo Platform's 2022 and 2023 K-1s show that Seva continues to hold those interests; and (c) Octo impermissibly conditioned the Repurchase on a general release of claims by Seva.

The interpretation of contractual language is unquestionably a question of law.[87] When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.[88] "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving

---

[87] *See Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("A judicial interpretation of a contract presents a question of law . . ."); *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *9 (Del. Super. Ct. Feb. 2, 2021) ("The interpretation of contractual language . . . is a question of law."); *OSI Sys. v. Instumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. Mar. 14, 2006) ("Under Delaware law, the proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal.") (cleaned up).

[88] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

effect to all provisions therein."[89]   If the contract language is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[90]   A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.[91]   The test to determine if ambiguity exists is not what the parties intended it to mean, but "what a reasonable person in the position of the parties would have thought it meant."[92]   In cases where ambiguity creates factual disputes and requires consideration of extrinsic evidence, "summary judgment is improper."[93]

### 1. The Repurchase Note Condition

Section 8.7(d) of the LLC Agreement dictates the closing procedures for the Repurchase Option.   First, closing shall occur "on the date designated by the Company in the Repurchase Notice," which shall not be more than sixty (60) days nor less than five (5) days after the delivery of such notice."[94]   After making certain offsetting and additive payments, the "Company shall pay . . . by delivery of a

---

[89]   *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985).

[90]   *RSUI Indem. Co*, 248 A.3d at 905.

[91]   *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).

[92]   *Id*.

[93]   *GMG Cap. Invs., LLC*, 36 A.3d at 783.

[94]   LLC Agreement § 8.7(d)(i).

Repurchase Note for the balance of the Repurchase Price, if any."[95]    Section 8.7(d)(iii) later provides that if the:

> Repurchase Holder shall fail to appear at the closing . . . or shall otherwise fail to comply with its obligations under the [LLC Agreement], the Company may thereupon place an amount of, equal to the amount of the purchase price to be paid for the Membership interests in escrow for the applicable Repurchase Holder.[96]

Seva jumps on the latter clause to argue that Octo was obligated to place the amount of the purchase price in escrow, and that putting the Repurchase Note in escrow did not satisfy the payment delivery conditions.

At a minimum, these provisions are ambiguous, and without further development of the facts at trial to better ascertain the parties' intent, genuine issues of material fact preclude the Court from making a ruling at this stage.

On the one hand, these provisions—whether to pay via delivery of Repurchase Note or cash in escrow—do not appear disjunctive; both may represent acceptable means of payment. The language under Section 8.7(d)(i) is mandatory. Octo Platform "*shall* pay . . . by delivery of a Repurchase Note."[97]  The language under Section 8.7(d)(iii), on the other hand is permissive—if Seva fails to perform its obligations under the Agreement, Octo Platform "*may* thereupon place an amount

---

[95]   *Id*.

[96]   *Id*. § 8.7(d)(iii).

[97]   *Id*. § 8.7(d)(i).

of, equal to the amount of the purchase price to be paid for the Membership interests in escrow."[98] Nothing in Section 8.7(d)(iii) prohibits Octo from initially delivering the Repurchase Note, and then later holding onto the Repurchase Note as if in "escrow." Section 8.7(d)(iii) may be reasonably interpreted as providing for a non-mutually exclusive option to place an equivalent amount in cash in escrow in the event Seva fails to perform its obligations. The language is not particularly clear as to whether an equivalent amount in cash is the only option or whether holding onto the Repurchase Note until its execution satisfies Section 8.7(d)(iii)'s so-called escrow requirement. Ultimately, it may have caused no prejudice to Seva and the Court may conclude upon further development at trial that Octo's interpretation of Section 8.7 is more reasonable.

All that said, the provisions may be read disjunctively as well. The requirement to pay by delivery of the Repurchase Note was the requirement at closing, whereas the requirement to place an amount in escrow was the requirement that governed in the event that the Repurchase Holder failed to comply with its obligations under the LLC Agreement. In the latter scenario, the added benefit to Octo of treating the interests as cancelled may therefore have imposed a corresponding burden of putting the equivalent value of the Repurchase Note in escrow. The parties have not supplied any extrinsic evidence and while it is the

---

[98]   *Id*. § 8.7(d)(iii).

prerogative of the Court to ultimately determine which interpretation is more reasonable, the Court does not find it proper to do so until the issues have been fully developed at trial.

### 2. A Genuine Issue of Material Fact Exists as to Whether the Repurchase Agreement was "Customary."

Seva argues that Octo Platform impermissibly conditioned the Repurchase on a general release of claims by Seva. LLC Agreement Section 8.7(d)(iii) provides that;

> The Company shall be entitled to receive customary representations and warranties from the sellers of any securities purchased pursuant to [the Repurchase Option] regarding such sale of Membership Interests . . . (including representations and warranties regarding good title to such Membership Interests . . . free and clear of any liens or encumbrances).[99]

The Repurchase Agreement that Octo Platform attached with the Repurchase Notice contained a release that encompassed claims Seva:

> may have or claim to have . . . for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising out of, related to or in connection with the Repurchase Units.[100]

The parties dispute whether inclusion of this release went outside the scope of Octo's entitlement to receive "customary representations and warranties." The

---

[99] *Id.*

[100] Rusk Trans. Aff., Ex. A § 4.3 to Repurchase Notice.

-27-

parties primarily rely on *ipse dixit* arguments as to whether the release was outside the scope or not. More is needed to prevail on a Rule 56 motion.

For example, Octo merely points out that the language of the LLC Agreement does not suggest that the release isn't customary, and that releases given to other employees were much broader.[101] That may be so, but past practice is relevant extrinsic information for consideration at trial to resolve an otherwise undefined, ambiguous term. On reply, Octo also argues that delivery of "representations and warranties required by the Company" means those representations and warranties that are "customary."[102] But that only begs the question of what indeed is "customary."

Seva, on the other hand, argues that Octo could only require representations and warranties limited to "statements of fact about the condition of the Membership Units," because the representations and warranties include those regarding "good title to such Membership Interests or other equity securities, free and clear of any liens or encumbrances."[103] With the language of Section 8.7(d)(iii) of the LLC Agreement, that, too, may be a plausible reading.

As mentioned, "customary" is not a defined term and the parties chose not to

---

[101] Octo Mot. for Summ. J. at 75.

[102] Reply Brief of Octo Consulting Group, LLC and Octo Platform Equity Holdings, LLC, in Support of their Motions for Partial Summary Judgment at 8 (D.I. 108).

[103] Kakar Ans. Br. at 12-13; LLC Agreement § 8.7(d)(iii).

attach a draft Repurchase Agreement to the LLC Agreement. Given the present record, further development is needed to ascertain the parties' intent on the ambiguity of "customary" here.

### 3. The K-1s

Seva argues that Octo's K-1s demonstrate that it never canceled Seva's interests. And, in its answering brief opposing Octo's motion for summary judgment, Seva seeks judicial estoppel of Octo from asserting that it canceled the membership interests.

Octo disputes whether the K-1s were inaccurate.[104] Upon reviewing the record, the Court finds that genuine issues of material fact exist as to the accuracy of the K-1s. And it seems Section 8.7(d)(iii) may entitle Octo Platform to "cancel" and "treat" the membership interests "as having been purchased" if Seva failed to comply with the obligations under Section 8.7, regardless of the accuracy of subsequent K-1s.[105] Whether Seva complied with all of its obligations is still to be decided. And until it is, the parties' request for rulings on the question of the K-1s is premature—as are questions of judicial estoppel.

For these reasons, the parties' motion for summary judgment as to Counts II

---

[104] Answering Brief of Octo Consulting Group, LLC and Octo Platform Equity Holdings, LLC in Opposition to Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment at 44-45 (D.I. 101).

[105] *Id*. § 8.7(d)(iii).

and IV of the Court of Chancery Complaint will be denied.[106]

## D. REMAINING COUNTS

Seva's motion for summary judgment as to Count V will be denied. Seva's purported right to purchase the membership interests of departing Sevatec employees depends on Seva's status as a member at the time of the employee's departures. Because the question of Seva's membership status has yet to be decided, Seva's motion for summary judgment on Count V must be denied.

Octo's motion for summary judgment on Count III will be granted to the extent Seva seeks a declaration that the Repurchase is void based on Octo Platform's material breaches of the various agreements. Seva did not address Octo's arguments on this point in its answering brief, and accordingly failed to explain why a purported breach in one agreement by a counterparty is sufficient to void a right in an entirely separate agreement by that counterparty. Seva has therefore abandoned this aspect of Count III.[107]

Finally, Octo's motion for summary judgement dismissing Counts VI and VII will be denied because they seek remedies the viability of which depend on the underlying validity of the Repurchase.

---

[106] Because Count IV's allegations of bad faith depend in part on non-compliance with the repurchase procedures, genuine issues of material fact remain precluding a ruling on this Count.

[107] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

## VI. CONCLUSION

Consistent with the above, Octo's motion for summary judgment on Count I and III is **GRANTED**. Each party's motion for summary judgment on the remaining counts are **DENIED.**

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge*

Original to Register in Chancery
cc: All counsel via File & Serve

---

\*   Sitting by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Sept. 18, 2023) (FIRST AMENDED ORDER).